## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

| | |
|---|---|
| **DIANA M. OVERY,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | )    **Case number 4:05cv2084 TCM** |
| | ) |
| **JO ANNE B. BARNHART,** | ) |
| **Commissioner of Social Security,** | ) |
| | ) |
| **Defendant.** | ) |

## MEMORANDUM AND ORDER

This 42 U.S.C. § 405(g) action for judicial review of the final decision of Jo Anne B. Barnhart, the Commissioner of Social Security ("Commissioner"), denying the application of Diana M. Overy for disability insurance benefits ("DIB") under Title II of the Social Security Act ("the Act"), 42 U.S.C. §§ 401-433, and for supplemental security income benefits ("SSI") under Title XVI of the Act, 42 U.S.C. §§ 1381-1383b is before the Court[1] for a final disposition. Ms. Overy has filed a brief in support of her complaint; the Commissioner has filed a brief in support of her answer.

## Procedural History

Diana Overy ("Plaintiff") applied for DIB and SSI in August 2003, alleging she had been disabled since September 30, 2002, as a result of depression, anxiety, ulcers, gastroesophageal reflux disease ("GERD"), drug, alcohol, and nicotine abuse, hypertension,

---

[1] The case is before the undersigned United States Magistrate Judge by written consent of the parties. See 28 U.S.C. § 636(c).

and headaches.  (R. at 71-73, 137-39.)[2]  Her applications were denied initially and after a

hearing held in February 2005 before Administrative Law Judge ("ALJ") Jhane Pappenfus.

(Id. at 13-24, 28-62, 66-70, 74-75, 109-13.)  The Appeals Council denied Plaintiff's request

for review, effectively adopting the ALJ's decision as the final decision of the Commissioner.

(Id. at 5-7.)

## Testimony Before the ALJ

Plaintiff, represented by counsel, testified at the administrative hearing.

Plaintiff testified she lived in a trailer home with a friend.  (Id. at 33.)  She weighed

281 pounds.  (Id. at 42.)  She was not, and never had been, married.  (Id. at 33.)  She had

finished the 10th grade, but had not obtained a General Equivalency Decree ("GED").  (Id.)

She had no vocational training.  (Id. at 34.)  She had, however, been certified as a nurse's

aide and had worked for at least ten different employers in that capacity.  (Id.)  Her last job

was in December 2002 and lasted less than one week.  (Id. at 34-35.)  She had not worked

in any jobs other than as a nurse's aide.  (Id. at 36.)

Asked to describe the pain or other problems that prevented her from working,

Plaintiff replied that her lower back pain prevented her from standing longer than 15

minutes.  (Id.)  She had discussed that with her doctor, Dr. Rasheed, but he told her to quit

smoking – she smokes two packs a day – and start exercising.  (Id. at 37, 38.)  She had done

neither.  (Id. at 37.)  She had tried to stop smoking four months ago when she was in the

[2]References to "R." are to the administrative record filed by the Commissioner with her answer.

- 2 -

hospital and was given a patch. (Id. at 38.) She did not smoke for the three days she was in the hospital, but started immediately on discharge. (Id.) She also had tension headaches, at least three times a week, and stomach problems. (Id.) The headaches last no longer than 30 minutes if she takes medication and all day if she does not. (Id. at 39.) They are caused by stress, anxiety, and depression. (Id.) The medication for her headaches cause drowsiness. (Id. at 57.) She has GERD and a "bad esophagus and a bad stomach." (Id. at 40.) Although she takes medication for these problems, she still has them. (Id.) Specifically, she gets a burning feeling in her stomach and, if it gets too bad, vomits. (Id. at 41.) She then becomes dehydrated and has to go to the hospital. (Id.) Indeed, she had thrown up three times two days before the hearing. (Id.) Compazine stops the vomiting. (Id. at 41-42.) She gets sample medication from her doctor because she cannot afford the prescription. (Id. at 42.) Before the most recent bout, she had last thrown up a month ago, although she throws up phlegm "[a]lmost every day" and primarily in the morning or afternoon. (Id. at 42-43.)

She sees a psychiatrist once a month to get medication for depression, anxiety, and panic. (Id. at 44.) There are no side effects from the psychotropic medication. (Id. at 57.) She sits at home and cries "all the time." (Id. at 45.) She feels hopeless about the future. (Id.) She has not spoken with her son in seven months and is not allowed to see her two grandchildren. (Id.) She worries about her bills because she cannot pay them. (Id. at 46.) For the past four years she has lived with Diane Willgohs in Diane's trailer. (Id.) Her crying during the hearing was because of anxiety and panic. (Id. at 47.) For at least seven days a

month, she sits and cries for the better part of the day.  (<u>Id.</u> at 49.)  For four days a month, she feels good and does not cry at all.  (<u>Id.</u> at 50.)  For the other days, she just sits at home.  (<u>Id.</u>)  Her roommate has two jobs and is at home all day only on Thursdays.  (<u>Id.</u>)

When Plaintiff has a panic attack, she starts sweating, her hands start shaking, her stomach starts burning, and she wants to go home.  (<u>Id.</u> at 47, 48.)  She has a panic attack every day.  (<u>Id.</u> at 48.)  She takes medication for her stomach when the doctors prescribe it.  (<u>Id.</u>)  Additionally, her panic attacks cause her not to want to leave her house.  (<u>Id.</u>)  She last left her house two weeks before to visit a friend.  (<u>Id.</u>)

When she is "really" depressed, she sleeps.  (<u>Id.</u> at 49.)  Otherwise, she has trouble sleeping and has to take medication to help.  (<u>Id.</u>)  The prescriptions for her sleep medication and psychotropic medication had been changed the previous February and January, respectively.  (<u>Id.</u> at 57-58.)  Her psychiatrist, who she sees once a month, only prescribes medication.  (<u>Id.</u> at 58.)  There is no counseling or therapy.  (<u>Id.</u>)

Plaintiff further testified that it had been over four years since she drank alcohol.  (<u>Id.</u> at 51, 52.)  When she did drink, she drank from a 12-pack to a case of beer a day.  (<u>Id.</u> at 51.)  She just stopped drinking one day.  (<u>Id.</u> at 51-52.)

Plaintiff tries to do dishes and laundry, but can work for only 15 to 20 minutes before pain in her back requires that she sit down.  (<u>Id.</u> at 52.)  When that happens, she uses a heating pad.  (<u>Id.</u>)  Plaintiff vacuums the floor; Diane gets on her hands and knees and does the mopping.  (<u>Id.</u> at 53.)  All total, Plaintiff spends approximately an hour and a half each day doing housework.  (<u>Id.</u> at 54.)  The rest of the time, she watches television or reads.  (<u>Id.</u>

at 55-56.)  When Plaintiff had food stamps, she would go the grocery store.  (Id. at 54.)
Diane would have to help carry the groceries to and from the car.  (Id.)  Diane gives her the
money for her cigarettes.  (Id. at 60.)

Although she has stomach problems and throws up, her doctors have not given her
a special diet.  (Id. at 59.)  They do think, however, that she might be diabetic.  (Id.)

At the conclusion of Plaintiff's testimony, her attorney asked leave to call her
roommate to testify.  (Id. at 60.)  Questioning what relevance that testimony would have
given Plaintiff's testimony that Diane was seldom at home, except on Thursdays, the ALJ
placed a letter from Diane in the record but declined to call her as a witness.  (Id. at 60-61.)

## Medical and Other Records Before the ALJ

The documentary record before the ALJ included forms Plaintiff completed as part
of the application process, documents generated pursuant to that application, records from
various health care providers, and evaluation reports.

Plaintiff reported in a questionnaire completed shortly after applying for DIB and SSI
that the following conditions prevented her from working:  manic depression; anxiety;
paranoid tendency; back and stomach pain; and sore knees.  (Id. at 174.)  Although she does
laundry, washes dishes, and makes the bed or changes sheets, she needs help doing so.  (Id.
at 176.)  She cannot do other household chores or run errands, e.g., she cannot iron, vacuum,
rake leaves, or go to the post office.  (Id.)  Her roommate does these chores and errands, and
also does the shopping.  (Id. at 176-77.)  It takes Plaintiff an hour and a half to go to sleep.
(Id. at 177.)  Sometimes, she needs help putting on her pants or tying her shoes.  (Id.)  She

watches television, reads books, or plays video games.  (Id. at 177-78.)  She tries to straighten the house and cope with her depression.  (Id. at 177.)  She drives on short errands.  (Id. at 178.)

Plaintiff reported on a different form that she was 5' 9" tall and weighed 260 pounds.  (Id. at 200.)  Her impairments first bothered her on October 17, 1997, and stopped her from working on September 30, 2002.  (Id. at 201.)  She tried to continue working, but had to stop on December 15 when she was fired after missing work for health-related reasons.  (Id. at 201, 209.)  Now no one would hire her and that was making her depression worse.  (Id. at 216.)

Plaintiff explained in a pain questionnaire that she had stomach and back pain.  (Id. at 173.)  The stomach pain caused her to throw up if she did not take her medication; her back pain caused a burning feeling across her lower back.  (Id.)  She also had an ulcer and a hiatal hernia.  (Id.)  The pain was fairly constant and had limited her activities since February 2003.  (Id.)  She takes Protonix or extra-strength Tylenol for the pain.  (Id.)

Diane Willgohs completed a form on Plaintiff's behalf, detailing how her impairments affected her daily activities.  (Id. at 180-88.)  She had known Plaintiff for four years.  (Id. at 180.)  Before her impairments, Plaintiff was able to hold down a job and do daily activities.  (Id. at 181, 187.)  She now needed medication to help her sleep.  (Id. at 181.)  She sometimes needed help putting on her pants or shoes or in getting out of the tub.  (Id.)  Although Plaintiff could fix sandwiches or warm frozen meals, Diane did the majority of the cooking.  (Id. at 182.)  Plaintiff did not go to any family functions because it made her

anxious and nervous.  (Id. at 183.)  If she walked to the mailbox, she needed to rest for 5 to 10 minutes before walking again.  (Id. at 185.)  Plaintiff had never been fired because of an inability to get along with other people.  (Id. at 186.)  Plaintiff did not handle stress well, and she was afraid of rain and storms.  (Id.)  Her depression and anxiety attacks were worse.  (Id. at 187.)  On many days, Diane would find Plaintiff just sitting and crying for no reason.  (Id.)  Plaintiff was a happier person when taking the medication prescribed by her previous doctor.  (Id. at 188.)

The earnings for Plaintiff for the years from 1977 to 2002, inclusive, were included in the record.  (Id. at 64.)  She had no earnings for the years 1983 though 1986, 1988, and 1989.  (Id.)  Her highest annual earnings, $9,859.66, were in 2002.  (Id.)  In only 7 of the 26 years listed were Plaintiff's average monthly earnings higher than $500.00.  (Id.)  In her earnings record for the 13 years from 1990 to 2002, inclusive, 66 different employers are listed.  (Id. at 116-25.)

Plaintiff's medical records before the ALJ are from St. Joseph Health Center ("St. Joseph"), Dr. Nashid Rasheed, or Dr. Omar Quadri.  Those records are summarized below in chronological order.

Plaintiff's medical records begin with those of a visit to St. Joseph's emergency room on January 3, 2002.  (Id. at 740-45.)  She complained of vomiting, diarrhea, and dizziness for the past eight hours.  (Id. at 741.)  Her medications included Wellbutrin, Seroquel, Xanax, and Cozaar.  (Id.)  Her past medical history included diagnoses of depression and

anxiety.  (Id.)  The diagnosis for her presenting problems was acute gastroenteritis.  (Id. at 745.)

Plaintiff next went to the emergency room the night of April 29, complaining of nausea, vomiting, diarrhea, and epigastric pain since that morning.  (Id. at 732-39.)  A chest x-ray was negative for any active disease.  (Id. at 739.)

On June 6, Plaintiff went to the emergency room with complaints of nausea, vomiting, and diarrhea.  (Id. at 726-31.)  On discharge four hours later, she was advised to have only clear liquids for the next 24 hours, to stop smoking, and to avoid caffeine.  (Id. at 727.)  She was also to return if her symptoms were worse.  (Id. at 731.)  Plaintiff did return the next day and was admitted for treatment with intravenous ("IV") fluids and antiemetics and for further evaluation.  (Id. at 712-13.)  A small bowel endoscopy biopsy revealed gastritis.  (Id. at 722-25.)  The recommendation was to start Plaintiff on a clear liquid diet and to continue with proton pump inhibitors ("PPI") to block gastric acid production.  (Id. at 724.)

Plaintiff went to the emergency room again the next week with complaints of vomiting and a burning sensation in her abdomen of one week's duration.  (Id. at 700-11.)  The morning before she had eaten fast food and had later developed diarrhea and vomiting.  (Id. at 701.)   Her medications were Wellbutrin (an antidepressant), Seroquel (an antipsychotic and dibenzothiazepine derivative), Cozaar (for hypertension), and Protonix, a PPI.  (Id. at 701, 705.)  Her symptoms were relieved by the next day, and she was discharged.  (Id. at 703.)

Plaintiff went to the emergency room on October 6 with complaints of nausea and vomiting. (Id. at 691-98.) She weighed 230 pounds. (Id. at 692.) Her medications included Wellbutrin and Xanax, a benzodiazepine. (Id. at 692.) An abdominal and pelvic computed tomography ("CT") scan were each negative. (Id. at 697-98.) After being treated with IV fluids, Plaintiff was discharged home. (Id. at 692, 694.)

Plaintiff first consulted Omar Quadri, M.D., on November 19.[3] (Id. at 684, 686.[4]) Dr. Quadri noted that, because she had relocated, Plaintiff had been referred to him by a previous health care provider treating her for depression and anxiety. (Id. at 684.) Plaintiff informed him that she used to drink a 12-pack of beer a day until she passed out and also smoked 2 marijuana joints a day, but she had stopped doing both approximately one year ago. (Id.) Dr. Quadri noted as follows about Plaintiff:

> Has been feeling more depressed and anxious recently because of a considerable increase in psychosocial stressors. Wellbutrin has worked well for her in the past but feels that now it does not seem to be working. Explained that this could be due to an added psychosocial component to her depression which is unlikely to respond to medications and more likely to respond to supportive and cognitive behavioral psychotherapy. Has been "a bundle of nerves." Repord [sic] difficulty sleeping and Seroquel not working at all. Xanax used to help with reducing anxiety but does not work anymore. Discussed concepts of tolerance and dependence with longterm [sic] use. She has been on it for almost a year. . . .

(Id.) Dr. Quadri further discussed with Plaintiff her high risk for dependence on benzodiazepines. (Id.) In addition to increasing her dosage of Wellbutrin and adding

---

[3]Plaintiff's first visit was 60 minutes; the remaining visits were 30 minutes.

[4]Page 685 is blank.

Remeron, an antidepressant, Dr. Quadri prescribed Librium, a benzodiazepine, with the intent of gradually weaning Plaintiff off it.  (Id. at 686.)

At Plaintiff's next visit to Dr. Quadri, on January 7, 2003, she complained of insomnia and anxiety and reported feeling "easily overwhelmed" and unwilling "to come out of her room."  (Id. at 683.)  She had been taking her sister's Valium, a benzodiazepine, and wanted to be prescribed benzodiazepines.  (Id.)  Dr. Quadri discussed with her again her genetic disposition for benzodiazepine dependence, the cognitive and memory effects of such dependence, the need for escalating doses, and her dependence on benzodiazepines as the cause of her insomnia.  (Id.)  He reported that she was "[p]olite but demanding and with a fixed agenda of obtaining benzos."  (Id.)  She tried to find fault with any other medications. (Id.)  Seroquel was again prescribed; Lexapro, an antidepressant, was added; and Wellbutrin was renewed.  (Id.)  At Plaintiff's next monthly visit, she reported feeling much better and had a bright and euthymic affect.  (Id. at 682.)  She was sleeping well; her appetite was good. (Id.)  She did not ask for benzodiazepines.  (Id.)  Her previously-prescribed three medications were renewed.  (Id.)

When Plaintiff next saw Dr. Quadri, on March 18, she reported that she felt nervous all the time and her medications were not working.  (Id. at 681.)  She had been having frequent crying spells, but had a good appetite.  (Id.)  She was given samples of Lexapro and a prescription for Clonazepam, a benzodiazepine.  (Id.)  Wellbutrin and Seroquel were discontinued.  (Id.)  Plaintiff reported in April that she had been feeling better on the Clonazepam and was less anxious.  (Id. at 680.)  She continued to have insomnia.  (Id.)  She

was also under socioeconomic stress caused by fights with her girlfriend pressuring her to get a job and fights with her son about asking her for money. (Id.)

Plaintiff did not see Dr. Quadri in May. When she saw him next in June she reported being under a lot of stress as a result of her son prohibiting her from seeing her newborn grandchild, by one friend dying in her sleep, and by another friend's death from a heroin overdose. (Id. at 679.) The latter caused her go on a drinking binge until she passed out. (Id.) She denied any other use of alcohol or recreational drugs. (Id.) She "[v]ehemently denie[d] abusing or exceeding prescribed doses of [C]lonazepam." (Id.) She slept during the day and stayed awake at night. (Id.) She was advised to schedule some crisis visits with her case worker. (Id.) Her prescriptions were renewed. (Id.)

Explaining that she was "the most depressed . . . ever" because her daughter-in-law would not let her see her granddaughter, Plaintiff informed Dr. Quadri in August that she wanted to increase her antidepressant medication. (Id. at 677.) She had an euthymic affect. (Id.) Her dosage of Lexapro was doubled; her prescription for Clonazepam was renewed at the same dosage as previously ordered. (Id.)

When Plaintiff was next hospitalized, on October 2, after going to the emergency room with complaints of intractable nausea, Jing Min, M.D., examined Plaintiff and noted that she reported doing okay since being placed in June 2002 on a PPI. (Id. at 660-61.) She ran out of Protonix three days before and developed intractable nausea and vomiting the same day. (Id. at 661.) Obstructive series and chest x-rays were unremarkable. (Id. at 660.) Dr. Min advised Plaintiff to quit smoking; she had no intention of doing so. (Id. at 660-61.)

During that same hospitalization, the gastrointestinal ("GI") specialist, Robert B. Cusworth, M.D., examined Plaintiff and concluded that her nausea and vomiting was "possibly related to flare in [GERD] with rebound hyperacidity after PPI withdrawal." (Id. at 659.) He further concluded that she should resume the PPI use with either prescription refills or over-the-counter products. (Id.) He told her about the latter in case she could not get her prescription refilled. (Id.)

When Plaintiff next saw Dr. Quadri, on October 7, she reported that she had been hospitalized for severe nausea and vomiting after running out of Protonix and that her symptoms "got better once she was restarted on Protonix." (Id. at 673.) She further reported that she was "doing okay emotionally." (Id.) Dr. Quadri noted, however, that the front desk had reported that Plaintiff "was quite irritable upon presentation." (Id.) Plaintiff was sleeping better with the addition of Ambien; her appetite was poor because of her upset stomach. (Id.)

She woke on October 9 with nausea and vomiting. (Id. at 653.) On examination at St. Joseph's, she denied any abdominal pain; an obstructive series of x-rays was negative. (Id.) She was referred for GI and psychiatric consultations. (Id. at 654.) Dr. Cusworth noted as follows:

> The patient has had a drug screen that shows cannabinoids. Initially, she denied using them, she was provided an opportunity to discuss this and inquire how she might otherwise have the chemicals in her blood stream and she finally admitted reluctantly that she does use marijuana, but she didn't want to admit it because of fear of legal of [sic] repercussions.

(Id. at 655.)  He also noted that Plaintiff denied any alcohol use, but he questioned the worth of that denial given her failure to be candid about her marijuana use.  (Id.)  He concluded there was no need for a further GI workup, but there was a need for a psychiatric consultation.  (Id.)  Plaintiff had such a consultation by Saaid Khojasteh, M.D., the same day.  (Id. at 656-57.)  He noted that Plaintiff had a history of depression and that she reported that her symptoms were persistent but not severe.  (Id. at 656.)  She denied any suicidal or homicidal ideation and any history of chemical dependency, including any use of alcohol.  (Id.)  She reported that she had a good response to Wellbutrin.  (Id.)  Dr. Khojasteh opined that she had a major affective disorder, chronic, and a Global Assessment of Functioning of 40.[5]  (Id.)  She was to follow-up with Dr. Quadri.  (Id. at 657.)

Plaintiff did so in November.  (Id. at 672.)  Dr. Quadri described her as having an euthymic affect.  (Id.)  She told him she had seen a psychiatrist when last hospitalized who had changed her medication from Lexapro to Wellbutrin; she wanted to change back because the Wellbutrin caused her bad headaches.  (Id.)

---

[5]"According to the Diagnostic and Statistical Manual of Mental Disorders 32 (4th Text Rev. 2000), the Global Assessment of Functioning Scale is used to report 'the clinician's judgment of the individual's overall level of functioning.'"  **Hudson v. Barnhart**, 345 F.3d 661, 663 n. 2 (8th Cir. 2003).  See also  **Bridges v. Massanari**, 2001 WL 883218, *5 n.1 (E.D. La. July 30, 2001) ("The GAF orders the evaluating physician to consider psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." (interim quotations omitted)).  A GAF of 40 is at the high end of the range defined as indicating "[s]ome impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g. depressed man avoids friends, neglects family, and is unable to work . . .)." Diagnostic and Statistical Manual at 34.

On December 1, Plaintiff went to the emergency room with complaints of vomiting and abdominal cramping. (<u>Id.</u> at 635-51.) Nasir Rasheed was listed as her physician. (<u>Id.</u> at 635.) It was noted that Plaintiff had a history of depression. (<u>Id.</u> at 640.) She was given Reglan, a GI drug, and Protonix and discharged in a stable, improved condition. (<u>Id.</u> at 641.) X-rays of her abdomen were negative for any obstruction. (<u>Id.</u> at 639, 645.) Her medical history was positive for smoking, three packs a day, and alcohol. (<u>Id.</u> at 640.)

Two days later, Plaintiff consulted Dr. Rasheed. (<u>Id.</u> at 398-99.) She was told to rest and keep a log of her blood pressure, which she was to check twice daily. (<u>Id.</u> at 399.) Three days later, Plaintiff reported bilateral knee pain. (<u>Id.</u> at 396.) She was started on Darvocet and was diagnosed as having hypertension, GERD, hyperglycemia, and bilateral knee pain. (<u>Id.</u> at 397.)

Plaintiff reported to Dr. Quadri on December 9 that she had been depressed and sleeping poorly. (<u>Id.</u> at 668.) Although she denied fighting and aggressive behavior, she reported that she had recently been in a verbal altercation. (<u>Id.</u>) Plaintiff wanted to resume taking Seroquel. (<u>Id.</u>) The Seroquel was resumed; the Ambien discontinued. (<u>Id.</u>) Plaintiff consulted Dr. Rasheed on December 24 for off-and-on knee pain and swelling. (<u>Id.</u> at 394.) She was prescribed phentromine, an appetite suppressant, informed of its side effects, and counseled about weight loss. (<u>Id.</u> at 395.)

Plaintiff saw Dr. Quadri again on January 6, 2004. (<u>Id.</u> at 671.) She was in a good mood, was sleeping well, and had a good appetite. (<u>Id.</u>) She had not been in any arguments or fights. (<u>Id.</u>)

On January 21, Plaintiff was seen in Dr. Rasheed's office for complaints of bilateral knee pain. (Id. at 392-93.) She walked with a normal gait; she weighed 285 pounds. (Id. at 392.) She reported that she had been unable to fill the prescription for phentromine because she could not afford the medication. (Id.) A prescription for Vicodin, an opiate, was discontinued, and Plaintiff was started again on Darvocet. (Id. at 393.) She was also told to lose weight and decrease her carbohydrate intake. (Id.) Plaintiff had a CT scan of the abdomen and pelvis on January 23. (Id. at 313.) Both were within normal limits. (Id.) Plaintiff called Dr. Rasheed's office that same day, explaining that she had been to the emergency room after having panic attacks and wanted a prescription for "something." (Id. at 390-91.) She was told to avoid caffeine, nicotine, and spicy foods. (Id. at 391.)

In the evening of the next day, Plaintiff went to the emergency room, complaining of nausea, vomiting, and loss of appetite that began that day. (Id. at 624-34.) She informed the staff that she had begun a new medication which was exacerbating her problems. (Id. at 627.) Her impairments were listed as high blood pressure, anxiety, GERD, and obesity. (Id.) Four days later, Plaintiff returned to the emergency room with complaints of nausea caused by anxiety. (Id. at 616-23.) She was discharged within an hour. (Id. at 616, 623.) She had an appointment to see her psychiatrist in the morning. (Id. at 619.)

Complaining of nausea, vomiting, and abdominal pain that was an eight on a ten-point scale, Plaintiff went to the emergency room again on February 1. (Id. at 602-15.) She informed the staff that she had been vomiting all day and had been sick for over one year. (Id. at 607.) Plaintiff weighed 288 pounds. (Id.) An x-ray of her abdomen revealed a

nonobstructed bowel gas pattern.  (Id. at 611.)  She was advised to decrease her smoking, which then was three packs a day.  (Id. at 604, 607.)

At Plaintiff's February 12 visit to Dr. Rasheed, it was noted that Plaintiff was being prescribed Klonepin, the brand name for Clonzapem, by two doctors.  (Id. at 389.)  She was scheduled for a February 20 visit with the GI clinic and was told to continue on her diet. (Id.)  On March 11, Dr. Rasheed prescribed Vicodin for Plaintiff's complaints of knee pain. (Id. at 386-87.)  Nine days later, Plaintiff went to the emergency room with complaints of dull, moderate back pain caused by lifting a bag of clothes three days before.  (Id. at 593-601.)  She was discharged less than two hours later with prescriptions for Flexeril, a muscle relaxant, and Vicodin.  (Id. at 595.)

Five days later, Dr. Quadri noted that Plaintiff was exceeding the prescribed dosages of Clonazepam, going to the emergency room with complaints of panic attacks, and getting prescriptions for Clonazepam from her primary care physician.  (Id. at 670.)  She was "[j]ovial, joking [and] friendly," although she complained of feeling bad and anxious.  (Id.) She wanted to stop the Seroquel because it made her hungry and her physician wanted her to lose weight.  (Id.)  Dr. Quadri discussed with Plaintiff her dependence on Clonazepam, the symptoms of withdrawal, and the need for hospitalization if those symptoms became intolerable.  (Id.)  He did not prescribe any Clonazepam.  (Id.)  When Plaintiff returned to Dr. Quadri the next month, she complained of having insomnia since the Clonazepam had been discontinued.  (Id. at 669.)  She also complained of being depressed, anxious, and "panicky."  (Id.)  She wanted a prescription for Ativan, another benzodiazepine.  (Id.)  Dr.

Quadri explained that her dependence on alcohol and benzodiazepines was the cause for her anxiety and panic attacks.  (Id.)  He reassured her that she would get better over time.  (Id.)  He did not prescribe the Ativan.  (Id.)

At her April 5 visit to Dr. Rasheed's office, Plaintiff complained of neck and back pain.  (Id. at 382.)  She was not taking any pain medication, and was instructed to bring her medications the next visit.  (Id. at 382-83.)  Her weight was 280 pounds; she was noted to be obese.  (Id. at 382.)

On April 13, Plaintiff informed Dr. Quadri that her anxiety had been well controlled with one medication, Vistaril, but the medication made her feel sleepy.  (Id. at 667.)  She was feeling bad because her daughter-in-law had not let her see her grandchildren at Easter.  (Id.)  Six days later, Plaintiff told Dr. Rasheed that her neck pain was better, although she had knee pain.  (Id. at 380.)  On examination, her speech was muddled and she appeared to be "spaced out."  (Id.)  Her psychiatric medications had been recently increased; it was noted that psychiatry should be called that day about Plaintiff being over-medicated.  (Id. at 380-81.)

One week later, on April 27, Plaintiff went to the emergency room with complaints of nausea and vomiting beginning 15 hours before.  (Id. at 578-91.)  She was additionally assessed as having acute and chronic diarrhea and abdominal pain.  (Id. at 580.)

On May 4, Plaintiff consulted Dr. Rasheed about her nausea and vomiting.  (Id. at 378-79.)  She reported that the symptoms developed the day after she went off Protonix.  (Id. at 378.)  She was placed on a bland diet and her prescription for Protonix was renewed.  (Id.

- 17 -

at 379.)  That same day, Plaintiff also went to the emergency room for her complaints of nausea with vomiting.  (Id. at 564-77.)  She informed the doctors that Reglan "'work[ed] the best.'"  (Id. at 567.)  It was prescribed for her on discharge.  (Id. at 566.)  Plaintiff was discharged after being given medication, including Reglan and Protonix, and having rested.  (Id. at 570.)

Plaintiff consulted Dr. Rasheed on Friday, May 11, and complained of nausea, vomiting, cramping, and diarrhea since the previous Tuesday.  (Id. at 375.)  She had been out of a medication, Protonix, for a couple of days.  (Id.)  The next day, Plaintiff reported feeling much better on the Protonix.  (Id. at 377.)

Plaintiff also consulted Dr. Quadri on May 11.  (Id. at 666.)  She was feeling better since her dosage of Vistaril had been reduced; Lexapro was not working.  (Id.)  Dr. Quadri told her the medications were limited in their ability to alter her feelings of anxiety, depression, and anxiety and advised her to supplement the pharmacotherapy with psychotherapy.  (Id.)  Consequently, he gave her a list of counseling resources.  (Id.)

Plaintiff returned to Dr. Rasheed on May 21 after a course of severe vomiting.  (Id. at 375-76.)  She had been out of Protonix for a couple of days.  (Id. at 375.)  Irritable bowel syndrome was listed as a diagnosis.  (Id. at 376.)  She was instructed to keep her GI appointment.  (Id.)

On June 9, Plaintiff reported to Dr. Rasheed that she was having severe headaches and was sensitive to light.  (Id. at 373.)  Over-the-counter medications had not helped.  (Id.)

No psychological symptoms were observed, although anxiety was listed as a diagnosis, together with migraines, GERD, and hypertension.  (<u>Id.</u> at 374.)

In the afternoon of June 15, Plaintiff went to the emergency room with complaints of diarrhea, vomiting, and nausea since that morning.  (<u>Id.</u> at 539-52.)  Plaintiff weighed 264 pounds.  (<u>Id.</u> at 544.)  After an x-ray was taken and blood was analyzed, she was discharged home with a diagnosis of acute gastroenteritis.  (<u>Id.</u> at 541, 543, 548-52.)  Within five hours of discharge, she returned to the emergency room with the same complaints plus having a headache with pain that was a nine on a ten-point scale.  (<u>Id.</u> at 553-63.)  Her vomiting stopped after she took Imodium.  (<u>Id.</u> at 556.)  She was discharged with instructions to follow-up with Dr. Rasheed.  (<u>Id.</u> at 555.)

On June 30, Plaintiff went to the emergency room complaining of pain for the past 14 days caused by inflamed hemorrhoids as a result of a June 8 colonoscopy.  (<u>Id.</u> at 531-38.)  She was given a prescription for Motrin and suppositories and told to follow-up with Dr. Rasheed.  (<u>Id.</u> at 533.)  The next day, Plaintiff returned to the emergency room with complaints of a "tingle feeling" in her lips, hands, and feet and of dizziness.  (<u>Id.</u> at 528.)  The diagnosis was anxiety and hyperventilation.  (<u>Id.</u> at 525.)  The remedy was a prescription for Xanax.  (<u>Id.</u>)

When Plaintiff saw Dr. Quadri on July 7 she complained of being stressed because her anti-social son was living with her awhile and they fought constantly.  (<u>Id.</u> at 665.)  She wanted a medication to keep her calm.  (<u>Id.</u>)  Dr. Quadri told her that Lexapro would help with panic attacks originating from a biological cause but not with such attacks originating

from poor coping skills.  (Id.)  Again, he encouraged her to undergo individual counseling and not to rely on medication to keep her sedated.  (Id.)  Neurotin was added to help her with anxiety and panic "and attempts to get benzos."  (Id.)

Dr. Rasheed noted at Plaintiff's next, July 22 visit that Plaintiff complained of hip pain and headaches.  (Id. at 371-72.)  She had a normal gait.  (Id. at 371.)  A bone scan on July 29 was negative for any fracture or other osseous abnormality.  (Id. at 522.)

Plaintiff was in a good mood when she saw Dr. Quadri on August 4.  (Id. at 664.)  She had not been depressed and her primary complaint was insomnia.  (Id.)  Neurotin was discontinued; Ambien was added.  (Id.)

On August 18, Plaintiff twice went to the emergency room with complaints of abdominal pain.  (Id. at 501-18.)  The first visit had ended in her discharge with instructions to take an enema.  (Id. at 505.)  Plaintiff was unable to so, and her symptoms worsened.  (Id. at 503, 505.)  Her second visit ended in her discharge with a diagnosis of constipation, a prescription for a stool softener, and instructions to take an enema as needed.  (Id. at 502.)

Four days later, Plaintiff returned to the emergency room after she woke up with chest pain.  (Id. at 306-07, 474-500.)  She was given sublingual nitroglycerine, which improved her pain.  (Id. at 306, 478, 480.)  She was then been put on "nitro paste" and was pain free.  (Id.)  She was admitted to the hospital to rule out a myocardial infarction.  (Id. at 307.)  That same day, Plaintiff underwent a thallium stress test, but stopped exercising after 3 minutes and 12 seconds due to shortness of breath.  (Id. at 304–05.)  The test showed "a low probability of significant myocardial ischemia."  (Id. at 305.)  The next day, an exercise test

was conducted to assess Plaintiff's myocardial functioning and perfusion.  (Id. at 302-03.)
The test had be stopped after 3 minutes and 12 seconds for shortness of breath.  (Id. at 302.)
At that point, Plaintiff had a maximum heart rate of 121 beats per minute, and had achieved
68% of the age-predicted maximum heart rate.  (Id.)  The test did indicate a normal left
ventricular dimension and a normal overall left ventricular systolic function.  (Id.)  On
August 26, she reported to Dr. Rasheed that she had gone to the hospital for chest pain, but
had had none since.  (Id. at 369-70.)  Her hip pain had resolved on its own.  (Id. at 369.)  Dr.
Rasheed's impression was of hypertension, high cholesterol, GERD, abdominal cramps, and
anxiety.  (Id. at 370.)  Changes were made in Plaintiff's medications.  (Id.)  Later in the
afternoon that same day, Plaintiff went to the emergency room with complaints of abdominal
pain.  (Id. at 457-72.)  It was thought she might be lactose intolerant; she was instructed on
an appropriate diet.  (Id. at 458.)

Dr. Quadri noted at Plaintiff's September 1 visit that she had been going to the
emergency room "to try to get benzos" – the emergency room doctor had "finally told he
would not give her any habit forming drugs."  (Id.)  Plaintiff denied feeling depressed or
hopeless and did not appear as anxious as she reported to be.  (Id.)

On September 29, however, Plaintiff saw Dr. Rasheed and reported feeling anxious.
(Id. at 367-68.)  Two days later, Plaintiff was described by Dr. Quadri as being "very drug
seeking.  Has been going to ERs for nerve pills. . . .  Does not feel depressed but complains
incessantly about anxiety and stress."  (Id. at 662.)  She wanted a nerve pill from her primary
care physician; Dr. Quadri advised against it "given her history of abusing alcohol,

marijuana, and benzos in the past." (<u>Id.</u>) Her son was being verbally abusive; Dr. Quadri advised her to get a restraining order against him, to structure her life to reduce her stress, and to get counseling to deal with stress and to develop coping skills. (<u>Id.</u>)

A pelvic ultrasound on October 7 showed a cyst in Plaintiff's left ovary; the right ovary was not seen. (<u>Id.</u> at 301, 405.) A CT pelvic scan that same day showed two cysts in Plaintiff's left ovary, the largest was two centimeters. (<u>Id.</u> at 300, 404.) Again, the right ovary could not be seen. (<u>Id.</u>)

Plaintiff went to the emergency room on October 14. (<u>Id.</u> at 448-56.) She was treated for chronic gastritis. (<u>Id.</u>) Complaining of abdominal pain and nausea, Plaintiff returned to the emergency room two days later. (<u>Id.</u> at 434-47.) She explained that she had woken up the day before, a Friday, had called her physician, received no answer, and had run out of nausea medication. (<u>Id.</u> at 437.) She was not taking any medication to block stomach acid. (<u>Id.</u>) Two hours after admission, her abdominal pain was gone; however, she still had back pain. (<u>Id.</u> at 438.) She was sent home with a prescription for pain medication and with instructions to continue taking Protonix and to take Maalox as needed. (<u>Id.</u>)

Plaintiff went to the emergency room again in the early afternoon on November 2 with complaints of vomiting and abdominal cramps since that morning. (<u>Id.</u> at 412, 415, 422, 425.) She smoked two and one-half packs of cigarettes a day. (<u>Id.</u> at 417, 427.) Plaintiff was then admitted and was started on IV fluids. (<u>Id.</u> at 279-80.) She was a smoker, but denied the use of alcohol and drugs. (<u>Id.</u> at 279.) The diagnosis was recurrent and persistent nausea that Plaintiff was unable to manage at home, GERD, and a history of

hypertension and hypercholesterolemia.  (Id. at 280.)  On November 11, Plaintiff consulted Dr. Rasheed.  (Id. at 365-66.)  Plaintiff reported feelings of anxiety following a recent episode of vomiting and nausea.  (Id. at 365.)  She weighed 266.5 pounds.  (Id.)  Dr. Rasheed's impression was of hypertension, GERD, and anxiety.  (Id. at 366.)

On December 10, Plaintiff went to the emergency room with complaints of abdominal pain.  (Id. at 283-94.)  The pain had started two weeks before and had been diagnosed by her gynecologist as an ovarian cyst.  (Id. at 288.)  After being examined by the physician, she refused to undress for the nurse and appeared angry.  (Id. at 290.)  She was discharged an hour later with Motrin and instructions to drink plenty of fluids, rest, and follow-up with her gynecologist the following Monday.  (Id. at 286.)  Her condition was stable but had not improved.  (Id. at 291.)  Her pain was a seven on a ten-point scale.  (Id.)  Three days later, a pelvic ultrasound showed a "very small left adnexal cyst" which had regressed since a previous ultrasound.  (Id. at 267.)  The view of the right adnexa "was not well seen."  (Id.)  Three days later, she saw Dr. Rasheed.  (Id. at 362-63.)  She wanted to be taken off a medication, Seroquel, because it caused an increase in appetite.  (Id. at 362.)  Her weight was 281 pounds.  (Id.)  She reported feelings of anxiety and insomnia, and also reported that she had an appointment with psychiatry.  (Id.)  Her prescription for Sonata was discontinued.  (Id. at 363.)  Dr. Rasheed's diagnoses included GERD, hypertension, insomnia, anxiety, and depression.  (Id.) at 363.)

On January 9, 2005, Plaintiff went to the emergency room at St. Joseph's with complaints of moderate, sharp neck pain that began that day when she turned her head to the

left.  (Id. at 268, 273, 275.)  Her weight was 248 pounds.  (Id. at 275.)  She was given some Motrin, ice was applied, and, when her condition had improved, she was discharged an hour after arrival with instructions to follow-up with her physician.  (Id. at 271, 274.)

On February 8, Plaintiff went to the emergency room at St. Joseph's at 1:30 in the afternoon with complaints of nausea, vomiting, diarrhea, and burning abdominal pain since 9:00 that morning.  (Id. at 223, 228.)  It was noted that she previously had similar symptoms but had not been seen recently by a doctor.  (Id. at 228.)  Her skin was warm and dry.  (Id. at 229.)  Her medical history, based on her reports, included GERD, high cholesterol, depression, anxiety, and tension headaches.  (Id. at 230.)  Her weight was 280 pounds.  (Id.)  The impression was of acute gastroenteritis.  (Id. at 229.)  After three hours, she was discharged home in a stable, improved condition; and, she was given a prescription for one medication and instructions to also take another over-the-counter medicine and to follow-up with Dr. Rasheed.  (Id. at 226, 231.)

Five days later, Plaintiff returned to the emergency room.  (Id. at 238-53, 266.)  She complained of severe abdominal pain, made worse by laying flat or eating.  (Id. at 241.)  The pain had begun six to eight days ago, and she had been in the emergency room twice with similar complaints.  (Id.)  Her weight was 281 pounds.  (Id. at 243.)  An x-ray revealed no obstruction.  (Id. at 266.)  Her condition improved after she was given a GI "cocktail."  (Id. at 242.)  The diagnosis was GERD.  (Id.)  On discharge, she had no pain and was told to increase the Protonix to twice a day and to avoid coffee, alcohol, and spicy foods.  (Id. at 239, 244.)

A few months after Plaintiff applied for DIB and SSI, Michael P. Stacy, Ph.D. completed a Psychiatric Review Technique form ("PRTF") assessing her affective disorder, specifically her major depression with some anxious features. (Id. at 150-63.) Dr. Stacy concluded that this affective disorder caused Plaintiff mild restrictions in her activities of daily living and mild difficulties in maintaining concentration, persistence, and pace. (Id. at 160.) The disorder caused moderate difficulties in maintaining social functioning and one repeated episode of decompensation of any duration. (Id.) In his accompanying notes, Dr. Stacy noted that the first medical exam report specific to Plaintiff's mental health issues was her initial psychiatric assessment by Dr. Quadri dated November 19, 2002. (Id. at 162.) He then summarized other notes of Dr. Quadri and Plaintiff's report of her activities of daily living. (Id. at 162-63.) Her allegations were considered partially supported and partially credible. (Id. at 163.)

That same month, Dr. Stacy also completed a Mental Residual Functional Capacity Assessment of Plaintiff. (Id. at 164-66.) Of twenty listed mental activities, Plaintiff was rated as "moderately limited" in eight: her ability to carry out detailed instructions; her ability to maintain attention and concentration for extended periods; her ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; her ability to work in coordination with or proximity to others without being distracted by them; her ability to complete a normal workday and workweek without interruptions from psychologically based symptoms; her ability to interact appropriately with the general public; her ability to get along with coworkers or peers without distracting them

or exhibiting behavioral extremes; and her ability to travel in unfamiliar places or use public transportation.  (<u>Id.</u> at 164-65.)  She was not significantly limited by her affective disorder in the remaining thirteen activities.  (<u>Id.</u>)  Dr. Stacy further noted that, although Plaintiff had had some significant social stressors, her mental status had been fairly well preserved and had improved with treatment.  (<u>Id.</u> at 166.)

In December 2004, Dr. Quadri completed a Mental Residual Functional Capacity Questionnaire on behalf of Plaintiff.  (<u>Id.</u> at 407-11.)  He listed her diagnoses as major depression, antisocial and borderline personality traits, hypertension, GERD, and coronary artery disease.  (<u>Id.</u> at 407.)  Also listed were alcohol and marijuana abuse in remission and sedative abuse.  (<u>Id.</u>)  The prescribed medications were Seroquel, Lexapro, and Sonata.  (<u>Id.</u>)  Asked to describe any medication side effects that might have implications for working,  Dr. Quadri replied that Plaintiff had denied experiencing any side effects and "actually wanted more sedatives."  (<u>Id.</u>)  Her symptoms included generalized persistent anxiety; substance dependence; intensive and unstable interpersonal relationships and impulsive and damaging behavior; emotional lability; deeply ingrained, maladaptive patterns of behavior; and sleep disturbance.  (<u>Id.</u> at 408.)  Of the 25 listed work-related activities, Plaintiff's abilities were seriously limited in, but not precluded as to, only one activity – her ability to accept instructions and respond appropriately to criticism from supervisors.  (<u>Id.</u> at 409-10.)  Her abilities to do the remaining activities on a "day-to-day basis in a regular work setting" were either limited but satisfactory or were unlimited.  (<u>Id.</u>)  Her impairments would cause her to be absent from work approximately two days per month.  (<u>Id.</u> at 411, 421.)  Dr. Quadri

further noted, "I do not think that [Plaintiff] is unable to work. She may not want to work." (Id.)

## The ALJ's Decision

Addressing the first of the five steps in the evaluation process, see pages 30 to 34, below, the ALJ found that Plaintiff's earnings after September 2002 represented an unsuccessful work attempt and, therefore, the question was whether Plaintiff was disabled as of that month. (Id. at 15.)

Addressing the second step of whether Plaintiff's impairments were medically determinable and severe, the ALJ found that she had severe impairments of depression, anxiety, GERD, an ulcer, and active alcohol and drug abuse. (Id. at 15-16.) Her impairments of nicotine abuse, hypertension, and headaches were either controllable through treatment or medication, as were the nicotine abuse and hypertension, or were not supported by the record, as were the headaches. (Id. at 16.)

Addressing the third step of whether the severe impairments met or medically equaled a listed impairment, the ALJ concluded that they did not. (Id. at 16-23.) First, Plaintiff's activities of daily living indicated an ability to perform a wide range of such activities. (Id. at 16.) Second, the record established that Plaintiff had no behavioral problems or personal care problems and no difficulty getting along with others. (Id.) Third, she was able to understand, remember, and carry out short and simple instructions, she had a logical and goal-directed thought process, she had fair concentration, and she did not have any psychosis or mania. (Id. at 17.) Consequently, her concentration, persistence, and pace were no more

than moderately impaired.  (Id.)  Additionally, she had had only one or two episodes of deterioration or decompensation in a work or work-like setting.  (Id.)  When assessing Plaintiff's residual functional capacity ("RFC"), the ALJ summarized the medical records. (Id. at 18-21.)  The ALJ concluded that the "issue of [Plaintiff's] consumption of drugs and alcohol and her drug-seeking behavior cloud her credibility[,]" noting that Plaintiff had not mentioned her drinking binge when testifying that she had not had a drink in four years and that she had not been honest with her physicians about her marijuana use.  (Id. at 21.)  The ALJ further concluded that Plaintiff's continuous drug-seeking behavior undermined her credibility because she likely exaggerated the severity of her symptoms in order to receive stronger medication.  (Id.)  Additionally, Plaintiff failed to comply with her physicians' treatment and medication recommendations.  (Id.)  When she did, her symptoms were controlled.  (Id.)  In finding that Plaintiff's anxiety and depression did not significantly limit her functioning, the ALJ discounted Dr. Khojasteh's assessment of her GAF as being 40 because he did not have a longitudinal picture of her impairments, his assessment was without explanation or support in the record, and his assessment depended on the information provided by Plaintiff and on her subjective complaints.  (Id. at 22.)  On the other hand, the opinions of Dr. Quadri were based on his treatment of her over a two-year period, the medical evidence, and his examinations.  (Id.)  As to Plaintiff's gastritis, the ALJ found that Plaintiff's allegations of its severity were inconsistent with the objective findings and lack of any ongoing, "aggressively sought" treatment and were unsupported by the medical evidence and her activities of daily living.  (Id.)  Nor did the medical evidence support

Plaintiff's allegations of disabling pain.  (Id. at 23.)  The ALJ concluded that Plaintiff had the residual functional capacity ("RFC") to perform a wide range of medium exertional work, specifically work requiring a maximum lifting of 50 pounds, a frequent lifting of 25 pounds, and standing or walking for six out of eight hours, but was limited to work involving short, simple instructions.  (Id.)

Addressing the fourth step of the evaluation process, the ALJ concluded that Plaintiff's RFC precluded her from returning to her past relevant work.  (Id. at 23-24.)

At the fifth, and last, step, the ALJ found that, under the Medical-Vocational Guidelines ("the Grid"), a claimant's of Plaintiff's age,[6] education, vocational experience, and RFC was not disabled within the meaning of the Act.

## Legal Standards

Under the Social Security Act, the Commissioner shall find a person disabled if the claimant is "unable to engage in any substantial activity by reason of any medically determinable physical or mental impairment," which must last for a continuous period of at least twelve months or be expected to result in death.  42 U.S.C. § 1382c(a)(3)(A).  The impairment suffered must be "of such severity that [the claimant] is not only unable to do [her] previous work, but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 1382c(a)(3)(B) (alterations added).

---

[6]Plaintiff was born on February 1, 1960, see Record at 71, and was 45 years' old at the time of the ALJ's decision.

The Commissioner has established a five-step process for determining whether a person is disabled.  See 20 C.F.R. § 404.1520.  See also **Johnson v. Barnhart**, 390 F.3d 1067, 1070 (8th Cir. 2004); **Ramirez v. Barnhart**, 292 F.3d 576, 580 (8th Cir. 2002); **Pearsall v. Massanari**, 274 F.3d 1211, 1217 (8th Cir. 2002).  First, the claimant cannot be presently engaged in "substantial gainful activity."  See 20 C.F.R. § 404.1520(b).  Second, the claimant must have a severe impairment.  See 20 C.F.R. § 404.1520(c).  The Social Security Act defines "severe impairment" as "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities . . ."  Id. (alteration added).  "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on her ability to work."  **Caviness v. Massanari**, 250 F.3d 603, 605 (8th Cir. 2001).

At the third step in the sequential evaluation process, the ALJ must determine whether the claimant has a severe impairment which meets or equals one of the impairments listed in the regulations and whether such impairment meets the twelve-month durational requirement.  See 20 C.F.R. § 404.1520(d), and Part 404, Subpart P, Appendix 1.  If the claimant meets these requirements, she is presumed to be disabled and is entitled to benefits.  **Warren v. Shalala**, 29 F.3d 1287, 1290 (8th Cir. 1994).

Additionally, the evaluation during the administrative review process of the severity of a mental impairment in adults must follow the technique set forth in 20 C.F.R. § 416.920a.  This technique requires that the claimant's "pertinent symptoms, signs, and

laboratory findings" be evaluated to determine whether the claimant has a medically determinable impairment. Id. § 416.920a(b)(1). The degree of functional limitation resulting from this impairment must then be rated. Id. §§ 416.920a(b)(2) and (c). This rating follows a specific format, identifying four broad functional areas and analyzing the degree of limitation in each area imposed by the mental impairment. Id. §§ 416.920a(c)(3) and (4). The degree of limitation in the first three areas is rated on a five-point scale: "[n]one, mild, moderate, marked, and extreme." Id. § 416.920a(c)(4). The degree of limitation in the fourth area, episodes of decompensation, is rated on a four-point scale: "[n]one, one or two, three, four or more." Id. A rating of "none" or "mild" in the first three categories and "none" in the fourth will generally result in a finding that the mental impairment at issue is not severe. Id. § 416.920a(d)(1). On the other hand, if the mental impairment is severe, the medical findings about that impairment and the resulting limitations in the four functional areas are to be compared "to the criteria for the appropriate listed mental disorder." Id. § 416.920a(d)(2). If the claimant has a severe mental impairment that does not meet or equal the severity of any listing, then the claimant's residual functional capacity is to be assessed. Id. § 416.920a(d)(3). Section 416.920a(e) requires that the application of this technique be documented. An ALJ is to document the application in his or her decision. Id.

At the fourth step in the process, the ALJ "review[s] [claimant's] residual functional capacity and the physical and mental demands of the work [claimant has] done in the past." 20 C.F.R. §§ 404.1520(e) and 416.920(e) (alterations added). "[RFC] is what the claimant is able to do despite limitations caused by all the claimant's impairments." **Lowe v. Apfel**,

226 F.3d 969, 972 (8th Cir. 2000) (citing 20 C.F.R. § 404.1545(a)) (alteration added).

"[RFC] 'is not the ability merely to lift weights occasionally in a doctor's office; it is the ability to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world.'" **Ingram v. Chater**, 107 F.3d 598, 604 (8th Cir. 1997) (quoting McCoy v. Schweiker, 683 F.2d 1138, 1147 (8th Cir. 1982) (en banc)) (alteration added). Moreover, "[RFC] is a determination based upon all the record evidence[,]" not only medical evidence. **Dykes v. Apfel**, 223 F.3d 865, 866-67 (8th Cir. 2000) (alterations added). Some medical evidence must be included in the record to support an ALJ's RFC holding. **Id.** at 867. "The need for medical evidence, however, does not require the [Commissioner] to produce additional evidence not already within the record. '[A]n ALJ is permitted to issue a decision without obtaining additional medical evidence so long as other evidence in the record provides a sufficient basis for the ALJ's decision.'" **Howard v. Massanari**, 255 F.3d 577, 581 (8th Cir. 2001) (quoting Frankl v. Shalala, 47 F.3d 935, 937-38 (8th Cir. 1995)) (alterations in original).

In determining a claimant's RFC, the ALJ must evaluate the claimant's credibility. **Ramirez**, 292 F.3d at 580-81; **Pearsall**, 274 F.3d at 1217. This evaluation requires that the ALJ consider "(1) a claimant's daily activities, (2) the duration, frequency, and intensity of pain, (3) precipitating and aggravating factors, (4) dosage, effectiveness, and side effects of medication, and (5) residual functions." **Ramirez**, 292 F.3d at 581 (citing Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984) (subsequent history omitted)). Although an ALJ may not disregard subjective complaints of pain based only on a lack of objective

medical evidence fully supporting such complaints, "an ALJ is entitled to make a factual determination that a Claimant's subjective pain complaints are not credible in light of objective medical evidence to the contrary." Id. See also **McKinney v. Apfel**, 228 F.3d 860, 864 (8th Cir. 2000) ("An ALJ may undertake a credibility analysis when the medical evidence regarding a claimant's disability is inconsistent.").  After considering the Polaski factors, the ALJ must make express credibility determinations and set forth the inconsistencies in the record which caused the ALJ to reject the claimant's complaints. **Singh v. Apfel**, 222 F.3d 448, 452 (8th Cir. 2000); **Beckley v. Apfel**, 152 F.3d 1056, 1059 (8th Cir. 1998).

The burden at step four remains with the claimant.  See **Banks v. Massanari**, 258 F.3d 820, 824 (8th Cir. 2001); **Singh**, 222 F.3d at 451.  "It is the claimant's burden, and not the Social Security Commissioner's burden, to prove the claimant's RFC." **Pearsall**, 274 F.3d at 1217.

If the ALJ holds at step four of the process that a claimant cannot return to past relevant work, the burden shifts at step five to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy. **Banks**, 258 F.3d at 824.  See also 20 C.F.R. § 404.1520(f).  "If [a claimant's] impairments are exertional (affecting the ability to perform physical labor), the Commissioner may carry this burden by referring to the medical-vocational guidelines or 'grids,' which are fact-based generalizations about the availability of jobs for people of varying ages, educational backgrounds, and previous work experience, with differing degrees

of exertional impairment." **Holley v. Massanari**, 253 F.3d 1088, 1093 (8th Cir. 2001) (alteration added). "However, when a claimant is limited by a nonexertional impairment, such as pain or mental incapacity, the Commissioner may not rely on the Guidelines and must instead present testimony from a vocational expert to support a determination of no disability." **Id.** Accord **Baker v. Barnhart**, 457 F.3d 882, 894-95 (8th Cir. 2006). If the claimant is prevented by his impairment from doing any other work, the ALJ will find the claimant to be disabled.

The ALJ's decision whether a person is disabled under the standards set forth above is conclusive upon this Court if it is supported by "substantial evidence on the record as a whole." **Dunahoo v. Apfel**, 241 F.3d 1033, 1037 (8th Cir. 2001); **Clark v. Apfel**, 141 F.3d 1253, 1255 (8th Cir. 1998); **Frankl**, 47 F.3d at 937. "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the decision." **Strongson v. Barnhart**, 361 F.3d 1066, 1069-70 (8th Cir. 2004) (interim quotations omitted). When reviewing the record to determine whether the Commissioner's decision is supported by substantial evidence, however, the court must also take into account whatever in the record fairly detracts from that decision. **Warburton v. Apfel**, 188 F.3d 1047, 1050 (8th Cir. 1999); **Baker v. Apfel**, 159 F.3d 1140, 1144 (8th Cir. 1998). The court may not reverse that decision merely because substantial evidence would also support an opposite conclusion, **Dunahoo**, 241 F.3d at 1037, or it "might have decided the case differently." **Strongson**, 361 F.3d at 1070. Thus, if "it is possible to draw two inconsistent positions from the evidence and one of those positions represents the agency's findings, the

[Court] must affirm the agency's decision." **Wheeler v. Apfel**, 244 F.3d 891, 894-95 (8th Cir. 2000) (alteration added).

### Discussion

Plaintiff argues that the ALJ erroneously (a) failed to obtain evidence from a VE and instead relied on the grids, an application that was precluded by her severe non-exertional impairments of depression, anxiety, obesity, and abdominal pain; (b) refused to permit an available and present third-party witness from testifying; and (c) determined her RFC based on the ALJ's own, unsupported diagnosis and not on the medical evidence. The Commissioner disagrees.

As noted above, the Commissioner may not rely on the grids at step five if a claimant is limited by a nonexertional impairment. See **Baker**, 457 F.3d at 894-95; **Holley**, 253 F.3d at 1093. Anxiety, depression, and obesity may cause nonexertional limitations. See 28 C.F.R. §§ 404.1569a(c), 416.969a(c). Nonexertional limitations "affect an individual's ability to meet the nonstrength demands of jobs," Social Security Ruling 96-4p, 1996 WL 374187, *1 (1996), "that is, demands other than sitting, standing, walking, lifting, carrying, pushing or pulling," 20 C.F.R. § 404.1569a(a). "Non-exertional impairments that 'do[ ] not diminish or significantly limit the claimant's residual functional capacity to perform the full range of Guideline-listed activities' do not prevent use of the grids, however." **Ellis v. Barnhart**, 392 F.3d 988, 977 (8th Cir. 2005) (quoting Shannon v. Chater, 54 F.3d 484, 488 (8th Cir. 1995)) (alteration in original). However, "'where the evidence of exertional limitations is extremely limited, and the dispute focuses on whether the claimant has the

emotional capacity to engage in sustained employment, resort to the grid is inappropriate.'"

**Foreman v. Callahan**, 122 F.3d 24, 26 (8th Cir. 1997) (quoting Tennant v. Schweiker, 682 F.2d 707, 709-10 (8th Cir. 1982)). As also noted above, the burden shifts at step five to the Commissioner. **Pearsall**, 274 F.3d at 1219.

The evidence of exertional limitations of Plaintiff is extremely limited. Although Plaintiff often and regularly went to the emergency room with complaints of nausea and vomiting, she consistently did so after she had run out of medication or, as found by her psychiatrist, when she was seeking benzodiazepines. Moreover, there is no indication in the record that she went on the restricted diets recommended by her primary care physician or the emergency room doctors. The ability of the PPI's to control her GERD and her failure to follow a diet to help alleviate the nausea militate against a finding of disability based on her exertional limitations. See **Johnson v. Apfel**, 240 F.3d 1145, 1148 (8th Cir. 2001) ("'[F]ailure to follow a prescribed course of remedial treatment without good cause is grounds for denying an application of benefits.'") (quoting Kisling v. Chater, 105 F.3d 1255, 1257 (8th Cir. 1997)) (alteration added).

The ALJ found that Plaintiff had nonexertional limitations of anxiety, depression, and obesity, but found these did not significantly limit her functioning. An example of a nonexertional limitation is a claimant's difficulty functioning because of nervousness, anxiety, or depression. 20 C.F.R. § 404.1569a(c)(1)(i). Dr. Quadri opined that Plaintiff's impairments would cause her to be absent from work approximately two days a month. Although the ALJ relied on Dr. Quadri's conclusions that Plaintiff engaged in drug-seeking

behavior, the ALJ did not address this finding, nor does the Commissioner address it in her brief. The Court finds that the inability to be at work approximately two days a month or twenty-four days a year is a significant limitation that precludes the application of the grids.

This inability, however, does not require a finding that Plaintiff is disabled within the meaning of the Act. Dr. Quadri does not explain whether the inability is attributable to Plaintiff's alcohol or drug abuse or whether it would be alleviated by counseling, as he repeatedly recommended Plaintiff undergo. Nor is there a report by any examining consultative physician or psychologist addressing these questions.

The Court notes that Plaintiff bears the burden of proving that her alcohol and drug abuse are not contributing factors to any disabling limitations. See **Mittlestedt v. Apfel**, 204 F.3d 847, 852 (8th Cir. 2000). See also 20 C.F.R. § 416.935 (describing criteria to be analyzed when deciding whether a claimant's alcohol or drug abuse is a contributing factor material to determination of disability). The Court further notes that impairments that are controllable by treatment are not disabling.

Because the case must be remanded for further proceedings, the Court will address the question of whether the ALJ erred by not calling Ms. Willgohs as a witness. Plaintiff's testimony established that she lived with Ms. Willgohs in Ms. Willgohs' trailer, that Ms. Willgohs paid the bills, and that they both were at home only one day a week. Although Ms. Willgohs was not permitted to testify, she had completed a form detailing how Plaintiff's impairments affected her activities of daily living and wrote a letter, admitted into the record, about the same. Plaintiff does not explain what Ms. Willgohs' testimony would have added

to her observations that had not already been placed in the record. Moreover, she clearly had a financial interest in Plaintiff being granted benefits. <u>See</u> **Lawrence v. Chater**, 107 F.3d 674, 677 (8th Cir. 1997) (holding that an ALJ may properly discredit the testimony of a third-party motivated by his or her desire to see the claimant obtain benefits).

### Conclusion

The ALJ erred by relying on the Medical-Vocational Guidelines to find Plaintiff not disabled after crediting the conclusions of Dr. Quadri, conclusions which included a significant nonexertional limitation. Accordingly, the case is remanded to the Social Security Administration for further proceedings, including the introduction of testimony by a VE and a determination of whether Plaintiff's alcohol and drug abuse are contributing factors to any significant limitations. <u>See</u> **Beckley**, 152 F.3d at 1060 (remanding case to Social Security Administration for further proceedings at which VE testimony must be adduced; claimant was being treated for depression and, although it was not severe enough to be disabling, claimant was entitled to have VE testify about its effect on her RFC); **Wiley v. Apfel**, 171 F.3d 1190, 1191 (8th Cir. 1999) (finding that ALJ had erred by relying on grid to determine whether claimant who suffered from nonexertional limitations could work).

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is REVERSED and that this case is REMANDED for further proceedings as set forth above.

An appropriate Judgment shall accompany this Memorandum and Order.

/s/ Thomas C. Mummert, III
THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE

Dated this 21st day of December, 2006.